FILED
2016 Sep-07  PM 12:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

| | |
|---|---|
| **JENNIFER PRESSLEY,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No.: 1:14-CV-1029-VEH** |
| | ) |
| **CITY OF ANNISTON and DARYL** | ) |
| **ABERNATHY, in his individual** | ) |
| **capacity,** | ) |
| | ) |
| **Defendants.** | ) |

## MEMORANDUM OPINION AND ORDER

## I.    INTRODUCTION AND PROCEDURAL HISTORY

### A.    Plaintiff's Claims

Plaintiff Jennifer Pressley ("Ms. Pressley") brings this job discrimination, sexual harassment, and retaliation lawsuit against Defendants City of Anniston (the "City") and Daryl Abernathy ("Mr. Abernathy"), her former supervisor. (Doc. 1). Her complaint contains a total of eleven counts–eight of which are federal claims and three of which arise under state law. (*See generally id.*).

### Ms. Pressley's Federal Claims

Count I is a Title VII failure-to-hire on the basis of gender claim asserted against the City. (Doc. 1 at 9). Count II is an equal protection-based failure-to-hire

on the basis of gender claim asserted against both the City and Mr. Abernathy pursuant to 42 U.S.C. § 1983. (Doc. 1 at 10). Count III is a Title VII sexual harassment claim asserted against the City. (*Id.* at 11). Count IV is an equal protection-based sexual harassment claim asserted against both the City and Mr. Abernathy pursuant to § 1983. (*Id.* at 14). Count V is a Title VII retaliatory harassment claim asserted against the City. (*Id.* at 16). Count VI is a Title VII retaliatory discharge claim asserted against the City. (*Id.* at 17). Count VII is a Title VII retaliatory failure-to-rehire claim asserted against the City. (*Id.* at 19). Count VIII is an equal protection-based retaliatory failure-to-rehire claim asserted against both the City and Mr. Abernathy pursuant to § 1983. (*Id.* at 21).

### Ms. Pressley's State Law Claims

Count IX is a negligent training and supervision claim asserted against the City. (Doc. 1 at 23). Count X is an invasion of privacy claim asserted against Mr. Abernathy. (*Id.* at 24). Finally, Count XI is an outrage claim asserted against Mr. Abernathy. (*Id.* at 25).

### B.    Defendants' Motions

The three pending motions are:  (i) Mr. Abernathy's Motion for Summary Judgment (Doc. 24) ("Mr. Abernathy's Motion") filed on January 14, 2016; (ii) the City's Partial Motion for Summary Judgment with attached evidence (Doc. 26) (the

"City's Partial Motion") also filed on January 14, 2016; and (iii) Mr. Abernathy's Motion To Strike Portions of Declaration of Jennifer Pressley (Doc. 52) (the "Strike Motion") filed on March 25, 2016. Defendants have filed evidence and briefs in support of these motions. (Docs. 25, 27, 30-32).

Ms. Pressley opposed the City's Motion on March 3, 2016 (Docs. 37, 38), and filed a corrected brief on March 15, 2016. (Doc. 44). Ms. Pressley opposed Mr. Abernathy's Motion on March 15, 2016 (Doc. 40) and his Strike Motion on April 8, 2016. (Doc. 54). Finally, both Mr. Abernathy and the City filed reply briefs in support of their respective motions. (Docs. 51, 53). For the reasons explained below the City's Partial Motion is **GRANTED IN PART** and **DENIED IN PART**. Mr. Abernathy's Motion is **GRANTED IN PART** and **DENIED IN PART**. Finally, Mr. Abernathy's Strike Motion is **TERMED** as **MOOT**.

## II.   STANDARDS

### A.   Summary Judgment

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R . CIV. P. 56(a). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510,  91 L. Ed. 2d 202 (1986). "Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to 'come forward with specific facts showing that there is a genuine issue for trial.'" *International Stamp Art, Inc. v. U.S. Postal Service*, 456 F.3d 1270, 1274 (11th Cir. 2006) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986)). Finally "[i]f the movant bears the burden of proof on an issue, because, as a defendant, it is asserting an affirmative defense, it must establish that there is no genuine issue of material fact as to any element of that defense." *International Stamp*, 456 F.3d at 1274 (citing *Martin v. Alamo Community College Dist.*, 353 F.3d 409, 412 (5th Cir. 2003)).

## B.   Employment Discrimination Generally

A plaintiff in an employment discrimination case maintains the ultimate burden of proving that the adverse employment decision was made because of intentional discrimination. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143,120 S. Ct. 2097, 2106, 147 L. Ed. 2d 105 (2000) ("Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" (quoting *Texas Dept. of*

4

*Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S. Ct. 1089, 1093, 67 L. Ed.

2d 207 (1981))); *Nix v. WLCY Radio/Rahall Comms.*, 738 F.2d 1181, 1184 (11th Cir.

1984) ("A Title VII disparate treatment plaintiff must prove that the defendant acted

with discriminatory purpose." (citing *Clark v. Huntsville City Board of Educ.*, 717

F.2d 525, 529 (11th Cir. 1983))).

The Supreme Court has established the basic allocation of burdens and order

of proof in a disparate treatment case, *see, e.g.*, *McDonnell Douglas Corp. v. Green*,

411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973); *Burdine*, *supra*; *Desert Palace*

*v. Costa*, 539 U.S. 90, 123 S. Ct. 2148, 56 L. Ed. 2d 84 (2003); that framework

applies in cases in which such as this there is no direct evidence of discrimination.[1]

*See Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir. 1987) ("The

*McDonnell Douglas-Burdine* patterns of proof were designed to ease the evidentiary

burdens on employment discrimin[a]tion plaintiffs, who rarely are fortunate enough

to have access to direct evidence of intentional discrimination." (citing *Thornbrough*

*v. Columbus and Greenville R.R.*, 760 F.2d 633, 638 (5th Cir. 1985), *abrogated on*

---

[1] As the Eleventh Circuit has explained, "only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age, . . . constitute direct evidence of discrimination." *Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir. 1989) (citing *Barnes v. Southwest Forest Industries, Inc.*, 814 F.2d 607, 610-11 (11th Cir. 1987)). In opposing summary judgment, Ms. Pressley does not contend that direct evidence of gender discrimination or retaliation exists in this case.

*other grounds by St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S. Ct. 2742,

125 L. Ed. 2d 40 (1993)).

Under the *McDonnell Douglas/Burdine* circumstantial evidence scheme, a

plaintiff first has the burden of proving by a preponderance of evidence a *prima facie*

case of discrimination. The burden of production then shifts to the defendant to

articulate a legitimate, nondiscriminatory reason for its employment decision. If the

defendant does so, the plaintiff must *either* prove by a preponderance of the evidence

that the legitimate reasons offered by the defendant are merely a pretext for

discrimination *or* present sufficient evidence, of any type, for a reasonable jury to

conclude that discrimination was a "motivating factor" for the employment action,

even though the defendant's legitimate reason may also be true or have played some

role in the decision. *McDonnell Douglas*, 411 U.S. at 802-05, 93 S. Ct. at 1824-26;

*Burdine*, 450 U.S. at 252-54, 101 S. Ct. at 1093-94; *Desert Palace*, 539 U.S. at 101-

02, 123 S. Ct. at 2155.

### C.    Evidentiary Rulings

"All evidentiary decisions are reviewed under an abuse-of-discretion standard."

*See, e.g., General Elec. Co. v. Joiner*, 522 U.S. 136, 141, 118 S. Ct. 512, 517, 139 L.

Ed. 2d. 508 (1997). "An abuse of discretion can occur where the district court applies

the wrong law, follows the wrong procedure, bases its decision on clearly erroneous

facts, or commits a clear error in judgment." *United States v. Estelan*, 156 F. App'x 185, 196 (11th Cir. 2005) (citing *United States v. Brown*, 415 F.3d 1257, 1266 (11th Cir. 2005)).

Moreover, as the Eleventh Circuit has made clear, not every incorrect evidentiary ruling constitutes reversible error:

> Auto-Owners' second argument is that it is entitled to a new trial on the basis of what it describes as a number of erroneous evidentiary rulings by the district court. Evidentiary rulings are also reviewed under an abuse of discretion standard. *Finch v. City of Vernon*, 877 F.2d 1497, 1504 (11th Cir. 1989). Moreover, even if Auto-Owners can show that certain errors were committed, the errors must have affected "substantial rights" in order to provide the basis for a new trial. *See* FED. R. EVID. 103(a). "Error in the admission or exclusion of evidence is harmless if it does not affect the substantial rights of the parties." Perry, 734 F.2d at 1446. *See also Allstate Insurance Co. v. James*, 845 F.2d 315, 319 (11th Cir. 1988).

*Haygood v. Auto-Owners Ins. Co.*, 995 F.2d 1512, 1515 (11th Cir. 1993). Therefore, even the existence of many evidentiary errors does not guarantee an appealing party relief from an adverse final judgment. Instead, such erroneous rulings by a district court must "affect the substantial rights of the parties" in order for reversible error to occur.

### III.   STATEMENT OF FACTS[2]

#### A.      General Background

Mr. Abernathy has worked for the City since 1998 and, during the time period relevant to this lawsuit, served as the assistant street superintendent for the City's Public Works Department (the "Department"). (AF No. 1).[3] Mr. Abernathy reports

---

[2]   This statement does not represent actual findings of fact. *See In re Celotex Corp.*, 487 F.3d 1320, 1328 (11th Cir. 2007) (observing that "a summary judgment proceeding . . . by definition involves no findings of fact . . . ."). Instead, the court has provided this statement simply to place the court's legal analysis in the context of this particular case or controversy.

[3]   The designation "AF" stands for admitted fact and indicates a fact offered by the moving party that Ms. Pressley has admitted in her written submissions on summary judgment, in her deposition testimony, or by virtue of any other evidence offered in support of her case. Under Appendix II of the court's uniform initial order (Doc. 3) entered on June 2, 2014, "[a]ll statements of fact must be supported by specific reference to evidentiary submissions." (*Id.* at 16). Further, this means that "[a]ny statements of fact that are disputed by the non-moving party must be followed by a specific reference to those portions of the evidentiary record upon which the dispute is based." (*Id.* at 17). Consequently, whenever Ms. Pressley has inadequately asserted a dispute over a fact that the moving party has otherwise substantiated with an evidentiary citation, the court has reviewed the cited evidence and, if it in fact fairly supports the factual assertion made by the moving party, has accepted that fact. On the other hand, whenever Ms. Pressley has adequately disputed a fact offered by the moving party, the court has reviewed the evidence cited by Ms. Pressley and, if it in fact fairly supports Ms. Pressley's factual assertion, has accepted Ms. Pressley's version. The court's numbering of admitted facts (*e.g.*, AF No. 1) corresponds to the numbering of Mr. Abernathy's undisputed statement of facts as set forth in Doc. 27 and responded to by Ms. Pressley in Doc. 40. A number following a decimal point corresponds to the particular sentence within the numbered statement of facts. For example, (AF No. 5.1) would indicate the first sentence of paragraph number 5 of Mr. Abernathy's statement of facts is the subject of the court's citation to the record.

directly to the public works director, Bob Dean ("Mr. Dean"), who, in turn, reports to the city manager, now Brian Johnson ("Mr. Johnson"), but who previously was Don Hoyt ("Mr. Hoyt"). (AF No. 2). Mr. Abernathy has four subordinates who report directly to him and who are first-level supervisors over the laborers in the Department: Danny Bussey ("Mr. Bussey"), John Duncan ("Mr. Duncan"), Tony Hill ("Mr. Hill"), and Joe McCarson ("Mr. McCarson"). (AF No. 3).

While laborers in the Department are generally assigned to one of the four supervisors, they can be shifted to another when necessary, according to the manpower needs of the Department on a daily basis. (AF No. 4). Ms. Pressley was hired as a temporary employee (or laborer) for the Department in May 2012. That seasonal employment ended six months later on or about October 11, 2012, when she was laid off.[4]

Bersheba Austin ("Ms. Austin"), the City's human resources director, served as its Rule 30(b)(6) representative. Based upon Ms. Austin's affirmative responses to questions about the City's EEOC investigative file, Ms. Pressley and five other temporary male workers were laid off, on October 11, 2012. (Doc. 30-1 at 3 at 8; *id.*

---

[4] The City's correspondence to the EEOC dated November 29, 2012, indicates that Ms. Pressley's seasonal employment began on May 9, 2012, and ended on October 18, 2012. (Doc. 54-1 at 1).

at 9 at 30).[5] Prior to October 11, 2012, Danielle McCurry ("Ms. McCurry"),who was the only other female seasonal employee, began permanent status on October 5, 2012. (Doc. 30-1 at 9 at 30). One seasonal worker–Mr. Langston–was retained during the October 2012 seasonal layoff and later obtained permanent employment due to a vacancy. (Doc. 30-1 at 45 at 174).

The City contends in its brief that "[n]one of the temporary employees that were part of the seasonal layoff in mid-October were hired as permanent employees." (Doc. 31 at 7 ¶ 30). However according to the contents of its own investigative file, four temporary laborers were subsequently called to return to work on October 29, 2012. (Doc. 30-1 at 9 at 30). Besides Ms. Pressley, only one other person from the group of six temporary employees who were laid off–Mr. Davis–did not come back to work for the City and that was because he quit. (Doc. 30-1 at 9 at 31-32).

## B.   Ms. Pressley's Complaints of Sexual Harassment and Other Misconduct by Mr. Abernathy

While Mr. Abernathy denies engaging in any inappropriate sexually-related conduct (PF No. 13),[6] several employees witnessed Mr. Abernathy viewing nude

---

[5] Any first page references to Doc. 30-1 correspond with the court's CM/ECF numbering system.

[6] "PF" stands for a proposed fact offered by Mr. Abernathy that Ms. Pressley has adequately disputed.

photos of Ms. McCurry, demanding to see nude photographs of Ms. Pressley, and asking Ms. Pressley to show him her breasts and tattoos. (Doc. 40 at 4 ¶ 13).[7] Similarly, although Mr. Abernathy denies having an improper relationship with Ms. McCurry (PF No. 14), several witnesses have testified that they saw him engage in sexually explicit conversations and gestures with her. (Doc. 40 at 4 ¶ 14).

More specifically, regarding Mr. Abernathy's treatment of Ms. Pressley, she claims that, weeks after she began as a temporary employee in the Department, Mr. Abernathy asked to see her tattoos. (AF No. 16). Mr. Abernathy indicated that he had heard Ms. Pressley had them all over her and he wanted to see them all even though most of them were covered up by her clothing. (AF No. 16). Ms. Pressley did not know how Mr. Abernathy knew about her tattoos. (AF No. 17). There had not been any prior discussion about them leading up to his remarks. (AF No. 17). Ms. Pressley testified that a few City employees were present when this happened, but she did not remember who. (AF No. 18). Ms. Pressley told Mr. Abernathy he would never see any more, and he "just kind of laughed." (AF No. 18). Ms. Pressley testified that he asked her this tattoo question daily and knows that some of the other employees heard him, as he said it numerous times, but she did not know of anyone specifically. (AF

---

[7]   Any page references to Doc. 40 correspond with the court's CM/ECF numbering system.

Nos. 18, 19).

Ms. Pressley also testified that Mr. Abernathy asked her to let him see pictures and nude pictures of her. (AF No. 20). On the first occasion Mr. Abernathy asked about nude pictures, it was "out of the blue" without any lead in or related group discussion. (AF No. 21). She answered that he would never see a picture of her naked, and Mr. Abernathy did not really respond to her. (AF No. 21). Ms. Pressley indicated that Mr. Abernathy asked her about nude photos of herself again on numerous times. (AF No. 22). Ms. Pressley said that Mr. Abernathy's requests for nude photos had been heard by a number of employees but that she could not recall all the persons or the number of occasions. (AF No. 23). As Arthur Davis ("Mr. Davis") who worked as driver in the Department covering the period of May 2012 to September 2012 (Doc. 37-2 at 1 ¶ 2) stated in his declaration, "Just about every time I was near Pressley and Abernathy together at the same time, which was almost daily, I heard Abernathy tell Pressley to show him her breasts, naked body, nude photos or tattoos." (Doc. 37-2 at 1-2 ¶ 3).

Ms. Pressley also remembered a time when the crew was near the bowling alley, and Mr. Abernathy pulled her aside alone and asked her if she were going to show him any nude pictures and did she have any nude pictures for him? (AF No. 24). She did not know why Mr. Abernathy would think that she had nude photos of

herself. (AF No. 24). She did testify that he did this "constantly, daily." (AF No. 24).

Ms. Pressley testified that another employee, Ms. McCurry, was showing pictures of herself on her cell phone and Ms. Pressley could see that at least one of the pictures was of Ms. McCurry nude. (AF No. 25). Mr. Abernathy and several other employees were there when this happened. (AF No. 26); (Doc. 26-1 at 27 at 104).[8]

On another occasion, Ms. McCurry was showing nude pictures of herself to employees when the crew was working over at the graveyard. (AF No. 27) Ms. Pressley recalled numerous employees were present. (AF No. 27). On this same day, Ms. McCurry was not only showing pictures of herself, but also was "pull[ing] her shirt out and . . . showing her boobs." (AF No. 28). Ms. Pressley further testified that Mr. Abernathy "looked at [her] and was like, well, now it's your turn, and [she] said, well no." (AF No. 28). Several other employees were present during this exchange. (AF No. 28).

On another instance during lunch next to the Sonic Drive-In, Ms. Pressley recalled that Ms. McCurry showed a nude picture to Mr. Abernathy after he had brought lunch boxes to her and Ms. McCurry. (AF No. 29). Mr. Abernathy then said, "now you owe me." (AF No. 29). Ms. McCurry started to show Mr. Abernathy more

---

[8] Any first page references to Doc. 26-1 correspond with the court's CM/ECF numbering system.

pictures, but Ms. Pressley could not see whether the image was a nude body or not. (AF No. 29).

On this particular occasion, Ms. Pressley took Mr. Abernathy's "you owe me" comment to mean he was talking about nude photos because he had asked for them so many times. (AF No. 30). "It was like in a conversation: you owe me. And, oh, y'all got them nude photos yet? You know, just every day." (AF No. 30).

One other time, Ms. Pressley testified they were "at the barn" and Mr. Abernathy asked her a "perverted question" like "does the carpet match the drapes." (AF No. 31). Ms. Pressley indicated that this means whether pubic hairs match the hair on the head. (AF No. 31). This was an out-of-the-blue comment and Ms. Pressley knew of no reason why he might ask such a thing. (AF No. 31).

During her deposition, Ms. Pressley could not remember any other specific examples in which Mr. Abernathy made improper remarks to her or in her presence. (AF No. 32). However, Ms. Pressley stated that there were plenty of other times and that it was constant. (AF No. 32).

Ms. Pressley complained to Mr. Bussey about Mr. Abernathy's behavior in August 2012. (Doc. 25-4 at 113). More specifically, Ms. Pressley spoke to Mr. Bussey after the graveyard incident and:

[T]old him what had happened and that it was constant -- like I needed

14

my job but I wasn't going to do that for my job and that -- I mean, it was
every single day, that it had to stop. And he told me that I would have
to take it up with my supervisor, which was Daryl [Abernathy].

(Doc. 25-4 at 113).[9]

Ms. Pressley further testified that, after Mr. Abernathy asked her to show him

her breasts in September 2012, she told him that "it had to stop." (AF No. 33). Shortly

thereafter, she was called into Mr. Abernathy's office with all of the supervisors. (AF

No. 34). Mr. Abernathy said he was the boss and he could do whatever he wanted to

do. (AF No. 34). Not long after that, Ms. Pressley was laid off in October 2012, along

with several other seasonal workers. (AF No. 34).

### C.    Mr. Abernathy's Supervision of Ms. Pressley

Mr. Abernathy recalls having two meetings with Ms. Pressley that are relevant

to her claims in this lawsuit. (AF No. 5.1). Mr. Abernathy testified that the first

meeting occurred after Ms. Pressley came to him and said, "Do not move Danielle

[*i.e.*, Ms. McCurry] off of another job anymore or I'll handle it." (PF No. 5.2). Ms.

Pressley additionally told Mr. Abernathy that if he "moved Danielle anywhere else,

---

[9]    Citing to Doc. 37-3, Ms. Pressley indicates in her brief that Mr. Bussey
confirmed that she complained to him about Mr. Abernathy's harassing actions. (Doc.
44 at 19 n.4). The court has checked Doc. 37-3 on CM/ECF and it is a duplicate filing
of Mr. Davis's declaration (Doc. 37-2) and not a copy of Mr. Bussey's deposition
transcript. The courtesy copy of Ms. Pressley's evidence that she provided to the
court contains the same error. The court has been unable to locate this evidence.

took her off of a job, then she would handle the situation herself." (PF No. 5.3). Ms. Pressley denies making either one of these statements to Mr. Abernathy. (Doc. 37-1 at 1 ¶ 2).

Mr. Abernathy testified that he gathered his foremen and met with Ms. Pressley because of her attitude and because it had been brought to his attention that she was moving around from foreman to foreman so that she could work with one particular employee. (AF No. 5.4). Mr. Abernathy counseled Ms. Pressley regarding going to a supervisor and getting herself changed after she had been given work to do by another foreman. (AF No. 5.5). Mr. Abernathy further spoke to her about refraining from "running her mouth and doubting [his] authority." (AF No. 5.5).

Mr. Abernathy indicated in his deposition that, while typically a temporary employee would be "let go" due to such conduct, an exception was made for Ms. Pressley because she had been on time, was always present, and as reported by the foremen was otherwise a good employee. (AF No. 6.1). Mr. Abernathy testified that he gave Ms. Pressley "three months of probation" before he would consider her for a permanent position, knowing that she would be laid off (as a temporary worker) and that when she came back to work in January 2013 (as most temporary employees would do), her probationary period would be over. (Doc. 25-1 at 113-14). Ms. Pressley disputes that she was ever placed on probation by Mr. Abernathy or anyone

else working for the City. (Doc. 37-1 at 1-2 ¶ 3).

A September 18, 2012, "Public Works Department Memo" signed by Mr. Abernathy memorializes his meeting with Ms. Pressley (and others) and confirms her being placed on probationary status. While that memo has been filed into the record (Doc. 32-1 at 1), Ms. Pressley challenges its authenticity. More specifically, she points out that the document was not utilized during the EEOC proceedings (Docs. 54-1, 54-2), mentioned in response to Ms. Pressley's complaint (Docs. 7, 8), or provided as part of Defendants' initial disclosures that included her personnel file. (Docs. 54-3, 54-4); (*see also* Doc. 54 at 4). The record was eventually produced to Ms. Pressley on May 1, 2015 (Doc. 54 at 4), without an explanation as to why it was not part of the City's initial disclosures that were served on November 20, 2014. (*See, e.g.*, Doc. 30-1 at 26 at 98-99 (answering "No, sir" when questioned if the City had any explanation for not including this probationary record as part of its initial disclosures)).

In their second meeting, with Mr. Duncan present, Ms. Pressley had questions about obtaining full-time employment. (AF No. 7). During this meeting, Mr. Abernathy gave Ms. Pressley the permanent-hiring paperwork for her to fill out and return. (AF No. 8). Ms. Pressley indicated in her deposition that "to the best of her memory" she turned her permanent paperwork into Mr. Abernathy before being laid

17

off in October 2012. (Doc. 26-1 at 39 at 150-51); (*see also* AF No. 35 ("[Ms. Pressley] filled out paperwork and an application for the purpose of being a permanent employee, those having been handed out to her, and she says she turned the papers into Abernathy.")). Ms. Pressley also testified that, before her temporary position ended, Mr. Abernathy told her that she had a permanent job, but she did not know exactly when that permanent position was scheduled to start. (Doc. 26-1 at 60 at 234-35).

The City never hired Ms. Pressley as a permanent employee. (Doc. 26-1 at 40 at 156). Ms. Pressley testified that she did not know who had gotten hired when and who did not; only that she had not. (Doc. 26-1 at 40 at 155-56). When asked during her deposition if she ever spoke to someone at the City about her paperwork that she had turned into Mr. Abernathy, Ms. Pressley testified, "Not about that because I was assuming that I was getting hired." (Doc. 26-1 at 40 at 156).

D. **Ms. Pressley's EEOC Filings and other Events Occurring after her temporary Employment Ended**

Ms. Pressley filed an EEOC charge on October 19, 2012.[10] The City received Ms. Pressley's EEOC charge on November 5, 2012. (Doc. 30-1 at 3 at 8); (*see also*

---

[10] The court has been unable to determine if or where Ms. Pressley's initial or amended EEOC charges have been filed into the record and has pulled the following administrative facts from the City's responses to those charges that are part of the summary judgment record.

Doc. 54-1 at 2 ("The city learned of her grievance from the EEOC notice we received on November 5th.")). This initial charge complained that "she was reprimanded and laid off in retaliation for complaining of sexual harassment . . . ." (Doc. 54-2 at 2).

Ms. Austin testified that she received an email from the City's payroll clerk on November 8, 2012, indicating that Mr. Abernathy had dropped off a new employee packet for Ms. Pressley who was supposed to start working in January 2013. (Doc. 26-3 at 54 at 209, 210).[11] When Ms. Austin later asked Mr. Abernathy about this paperwork, he told her that it had been on his desk and that he had decided to bring it to her. (Doc. 26-3 at 55 at 213). Ms. Austin testified that the delay (or gap in time) between Mr. Abernathy's submitting Ms. Pressley's paperwork and her anticipated hiring date in January was unusual based upon her experience. (*Id.* at 214).

On January 3, 2013, Ms. Pressley filed an amended EEOC charge that complained about not being "called to return back to work" and "allege[d] that her layoff as an employee . . . was discriminatory and done in retaliation for her having made complaints about sexual harassment and a hostile work environment . . . ." (Doc. 54-2 at 2). Ms. Austin was asked during her deposition if she knew who made the decision not to hire Ms. Pressley. (Doc. 26-3 at 34 at 131). She answered, "No,

---

[11] Any first page references to Doc. 26-3 correspond with the court's CM/ECF numbering system.

I don't know who made - - I don't know why she wasn't hired." (Doc. 26-3 at 34 at 131).

When asked during his deposition if the only reason Ms. Pressley did not become a permanent employee was because she did not personally come into his office with her paperwork, Mr. Abernathy answered, "She didn't follow procedure, so yes, sir." (Doc. 26-2 at 54 at 210, 211).[12] At another part of his deposition, Mr. Abernathy indicated that Ms. Pressley had been told during the second meeting he and Mr. Duncan had with her before her layoff that she was supposed to show up with her paperwork on January 3, 2013, to be hired. (Doc. 26-2 at 53 at 206). In contrast, Ms. Pressley testified that Mr. Abernathy told her that she had a permanent job when he gave her the paperwork. (Doc. 26-1 at 60 at 234). The City's statement of position to the EEOC dated February 18, 2013, indicates that Ms. Pressley was not called to return to work because she "was insubordinate, had posted negative remarks about the Respondent and some of its employees through social media outlets, and otherwise created concerns by Respondent as to her ability to perform her assigned tasks since the allegations made in her original charge of discrimination could not be corroborated at this time by Respondent." (Doc. 54-2 at 3). Ms. Pressley filed her

---

[12]  Any first page references to Doc. 26-2 correspond with the court's CM/ECF numbering system.

complaint against the City and Mr. Abernathy on May 30, 2014. (Doc. 1).

## IV.   ANALYSIS

### A.   The City's Partial Motion

Counts I-IX of Ms. Pressley's complaint are either asserted against the City exclusively or against both the City and Mr. Abernathy. In its brief, the City acknowledges that "factual disputes preclude summary judgment on some claims." (Doc. 31 at 8). The City expressly identifies Ms. Pressley's Title VII retaliation claim (asserted in Count VII) that she was not permanently hired because she complained about Mr. Abernathy's sexually-charged comments when she was a temporary employee as one in which summary judgment is not appropriate. (Doc. 31 at 14).

Without identifying the corresponding Counts, the City specifically seeks summary judgment on:  (i) Ms. Pressley's Title VII sexual harassment claims (Doc. 31 at 8); (ii) her Title VII gender discrimination claims (*id.* at 11); (iii) her Title VII retaliation claim premised upon being discharged and/or not being permanently hired because she complained about Mr. Abernathy's favorable treatment of Ms. McCurry (*id.* at 14); (iv) her § 1983 claims (*id.* at 16); and her negligent training and supervision claim. (*Id.* at 18).

In her opposition, Ms. Pressley points out that she is not pursuing a harassment

claim or a retaliation claim based on paramour favoritism. (Doc. 44 at 15, 28-29).[13]

Thus, those portions of the City's Partial Motion are **GRANTED** as abandoned. *See* collection of cases cited *infra* at 26-27. The court addresses the contested portions below.

> **1.    Ms. Pressley's Title VII Sexual Harassment Claim against the City**

A Title VII sexual harassment claim that is premised upon a hostile working environment created by a supervisor requires *prima facie* proof from a plaintiff:

> (1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable. *Henson*, 682 F.2d at 903–05.

*Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999).

With respect to evaluating the fourth element:

> [T]he Supreme Court and this Court have identified the following four factors that should be considered in determining whether harassment objectively altered an employee's terms or conditions of employment: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes

---

[13]    Any page references to Doc. 44 correspond with the court's CM/ECF numbering system.

with the employee's job performance. *Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir. 1997) (citing *Harris*, 510 U.S. at 23, 114 S. Ct. 367). The courts should examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or abusive working environment. *Id.*; see Harris, 510 U.S. at 23, 114 S. Ct. 367; *Henson*, 682 F.2d at 904; *Faragher*, 118 S. Ct. at 2283 (citing *Harris*, 510 U.S. at 23, 114 S. Ct. 367, and explaining that "[w]e directed courts to determine whether an environment is sufficiently hostile or abusive by 'looking at all the circumstances'").

*Mendoza*, 195 F.3d at 1246. Concerning the fifth element, "an employer may be vicariously liable for actionable hostile environment discrimination caused by a supervisor with immediate (or successively higher) authority over the employee—subject to an affirmative defense." *Mendoza*, 195 F.3d at 1245 n.4 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S. Ct. 2275, 2292-93, 141 L. Ed. 2d 662 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S. Ct. 2257, 2270, 141 L. Ed. 2d 633 (1998)).

Here, the severe or pervasive prong–the fourth element–is the only one that the City challenges on summary judgment. (Doc. 31 at 9). However, that effort is half-heartedly presented in its opening brief by way of a bare-bones four-sentence paragraph that lacks reference to any persuasive, much less binding, precedent. (Doc. 31 at 9-10). As the City urges, in a blanket fashion, "even if the jury believed Plaintiff and assumed that Abernathy asked to see Plaintiff's tattoos and/or nude photos, such

23

alleged instances were not sufficiently severe or pervasive to alter the terms and conditions of Plaintiff's employment." (Doc. 31 at 9). The City also contends that no "reasonably minded jurors [could] conclude that such alleged instances created an abusive working environment" and then unhelpfully adopts the facts and legal arguments made by Mr. Abernathy without specifying which ones are critical to the court's evaluation of this particular claim. (*Id.* at 9-10).

In doing so, the City minimizes the factual substance of what Ms. Pressley has testified that Mr. Abernathy did to her over a six-month period and pretends that, at most, Mr. Abernathy sporadically made only a few sexually-offensive statements directed towards her. Instead, Ms. Pressley's sexual harassment claim is premised upon Mr. Abernathy's repeated, numerous, and daily requests for her to show him her tattoos[14] and her nude photos. Additionally, on at least one occasion, Mr. Abernathy pressured her to show him her breasts and in another instance asked her, "Does the carpet match the drapes?" These sexually-demeaning incidents often occurred in front

---

[14] The court notes that asking to see someone's tattoos is not straightforwardly sexual in nature even if the tattoos are covered up by that person's clothes–such as one located on an ankle or a shoulder. However, for the purposes of summary judgment and reading the record in the light most favorable to Ms. Pressley, Mr. Abernathy's questions about Ms. Pressley's tattoos "might implicate sex discrimination," especially given his indication that he had heard she had them all over her body. *Mendoza*, 195 F.3d at 1248. Alternatively, even without factoring in Mr. Abernathy's inquiries about Ms. Pressley's tattoos, the court finds that Ms. Pressley's evidence is sufficient to create a triable issue of sexual harassment.

of other employees. All of these acts occurred over a relatively short period of time and, based upon her testimony, a reasonable jury could infer that Ms. Pressley endured some type of sexually-charged comment, question, or demand for a sexual favor by Mr. Abernathy at least once a week, if not more frequently than that. *See, e.g., Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010) ("Either severity *or* pervasiveness is sufficient to establish a violation of Title VII." (emphasis in *Reeves*) (citing *Ellerth*, 524 U.S. at 743, 118 S. Ct. at 2260)); *Reeves*, 594 F.3d at 803, 804 (noting as an underlying "essential fact" testimony from the plaintiff substantiating that sexually-offensive conduct occurred in the workplace "'on a daily basis'").

Further, the record, taken in a light most favorable to Ms. Pressley, substantiates that she did not welcome Mr. Abernathy's advances, that she rejected doing any of the sexually-charged acts that he was asking of her, that she was subjectively bothered by and complained to Mr. Bussey about Mr. Abernathy's objectionable conduct, that, despite her complaint, Mr. Abernathy's behavior continued, and that she demanded that Mr. Abernathy stop. Thus, the hostile work environment part of the City's Partial Motion is **DENIED** as underdeveloped,

factually incomplete, and unpersuasive.[15] The City's Partial Motion is further **DENIED** for those reasons, discussed *infra*, explaining why Mr. Abernathy is not entitled to summary judgment on Ms. Pressley's corresponding § 1983 sexual harassment claim.

### 2.   Ms. Pressley's Title VII Gender Discrimination Claim(s) against the City

The City treats Ms. Pressley's complaint as containing two distinct gender discrimination claims within Count I–one for being assigned worse jobs during her temporary employment period with the Department than men and the second for not being permanently hired because of her gender. (Doc. 31 at 12). Ms. Pressley makes no effort to support the merits of the first purported claim and, to the extent it has even been raised in her complaint, it is due to be dismissed as unopposed and/or abandoned by her. *See, e.g.*, *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001) (finding claim abandoned when argument not presented in initial response to motion for summary judgment); *Bute v. Schuller Int'l, Inc.,* 998 F. Supp. 1473, 1477 (N.D. Ga. 1998) (finding unaddressed claim abandoned); *see also Resolution*

---

[15]   The remainder of the City's brief concerning sexual harassment focuses upon Mr. Abernathy's treatment of Ms. McCurry as a separate actionable claim. (Doc. 31 at 10-11). As explained above, this part of the City's Motion is granted as this claim has been abandoned because Ms. Pressley has clarified that she is not pursuing a paramour favoritism claim.

*Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("We decline to exercise our discretion to entertain this argument which was not fairly presented to the district court."); *Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) (failure to brief and argue issue at the district court is sufficient to find the issue has been abandoned); *Hudson v. Norfolk S. Ry. Co.,* 209 F. Supp. 2d 1301, 1324 (N.D. Ga. 2001) ("When a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned."); *cf. Road Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp.,* 10 F.3d 1563, 1568 (11th Cir. 1994) (concluding that a district court "could properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment"); *McMaster v. United States,* 177 F.3d 936, 940-41 (11th Cir. 1999) (claim may be considered abandoned when district court is presented with no argument concerning a claim included in the plaintiff's complaint).

Ms. Pressley has opposed the dismissal of her second gender discrimination claim contained in Count I. "In a traditional failure-to-hire case, the plaintiff establishes a *prima facie* case by showing that: (1) [s]he was a member of a protected class; (2) [s]he applied and was qualified for a position for which the defendant was accepting applications; (3) despite h[er] qualifications, [s]he was not hired; and (4)

after h[er] rejection the position remained open or was filled by a person outside h[er] protected class. *Welborn v. Reynolds Metals Co.*, 810 F.2d 1026, 1028 (11th Cir. 1987) (per curiam)." *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1267 (11th Cir. 1999). Alternatively, the Eleventh Circuit has stated that:

> In cases where the evidence does not fit neatly into the classic *prima facie* case formula, for example, we have stated that "[a] *prima facie* case of disparate treatment can be established by any 'proof of actions taken by the employer from which we infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations.'" *Hill*, 841 F.2d at 1540 (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 576, 98 S. Ct. 2943, 57 L. Ed. 2d 957 (1978)).

*Schoenfeld*, 168 F.3d at 1268. Because Ms. Pressley complains that the City discriminated against her by not making her a permanent hire after working as a seasonal employee, her claim more appropriately matches the alternative *prima facie* formulation for gender discrimination. This means she must point to sufficient evidence from which a jury could reasonably infer gender discrimination by the City or, in this instance, its agent, Mr. Abernathy.

The City asserts that Ms. Pressley's discrimination claim fails because she cannot show "that she was subjected to an adverse employment action in contrast with similarly situated employees outside the protected class." (Doc. 31 at 11-12). However, in doing so, the City contends that "none of the employees who were

28

terminated from the seasonal layoff were hired permanently" (Doc. 31 at 12) and ignores the body of competing evidence contained in its <u>own</u> investigative file as substantiated by Ms. Austin. That evidence, instead, shows that <u>all</u> of the seasonal employees other than Ms. Pressley (and one other seasonal male employee who quit) became permanent employees.[16] Ms. McCurry and Mr. Langston were never laid off, and the remaining four male employees who were laid off with Ms. Pressley were rehired at the end of October 2012.

Nonetheless, the court concludes that Ms. Pressley's gender discrimination claim is inadequate for the same reason that her retaliation claim presents a triable issue–she lacks sufficient evidence of a <u>gender</u>-related animus, but she has adequate proof of a <u>retaliatory</u> one on the part of the City. Ms. Pressley's own description of why she believes she has presented a triable issue of gender discrimination underscores the correctness of the court's conclusion:

> Plaintiff is a female. There is no dispute that she was qualified for her position. Plaintiff was terminated from her temporary position with Defendant City and not hired on a permanent basis <u>after she complained about sexual harassment and filed charges with the EEOC.</u> Every male temporary laborer was hired full time by the City, except one who voluntarily quit. (City Depo., 30:22-31:3, 32:4-12). The only female hired by the City was McCurry who complied with Abernathy's sexual demands. (Doc. 37-2, ¶ 4). Sexual demands were not made of male

---

[16]   For this same reason, the City's purported legitimate explanation for not hiring Ms. Pressley–"no one got hired" (Doc. 31 at 13)–is contrary to the evidence.

laborers.

(Doc. 44 at 23 n.5) (emphasis added).

Further, the City's permanent hiring of Ms. McCurry (who never complained about sexual harassment by Mr. Abernathy) and several male seasonal employees (who also never complained about Mr. Abernathy's harassing behavior), while not hiring Ms. Pressley (who did complain), raises a reasonable inference of retaliation, but <u>not</u> of gender discrimination. *Cf. Richardson v. Alabama Pine Pulp Co.*, 277 F. App'x 907, 909 (11th Cir. 2008) (finding no error in district court's conclusion that *prima facie* case of race discrimination was lacking when "the undisputed evidence indicated that Richardson's duties were split between an African-American, <u>someone in her protected class</u>, and a white employee.") (emphasis added).

The court acknowledges but rejects Ms. Pressley's alternative efforts to save her gender discrimination claim from dismissal based upon a mixed-motive analysis. (Doc. 44 at 27-28). However, the court disagrees with Ms. Pressley that she has adduced sufficient evidence of a discriminatory intent <u>based upon her gender</u>. Therefore, the City's Partial Motion is **GRANTED** as to Count I.

### 3.   Ms. Pressley's Constitutional Claims against the City

The City raises two grounds for summary judgment on Ms. Pressley's

constitutional claims asserted against it pursuant to § 1983. First the City asserts that it "is entitled to summary judgment on the parallel theories and claims upon which it seeks summary judgment on the Title VII claims . . . ." because "when the factual basis for a plaintiff's § 1983 equal protection claim is the same as her Title VII claim, the elements of her § 1983 claim mirror the elements of her Title VII claim." (Doc. 31 at 16). In support, the City cites to *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008) ("These elements also apply to a claim of race discrimination under § 1983 because the analysis of disparate treatment claims under § 1983 is identical to the analysis under Title VII where the facts on which the claims rely are the same."), and *Stallworth v. Shuler*, 777 F.2d 1431, 1433 (11th Cir. 1985) (similar). (Doc. 31 at 16 n.19). Further, Ms. Pressley's opposition does not refute or distinguish this binding legal principle. Therefore, based upon the court's previous analysis of Ms. Pressley's Title VII gender discrimination claim, her constitutional claims premised upon equal protection and the City's failure to rehire her because of her sex are likewise subject to summary judgment. Because the court has denied summary judgment on Ms. Pressley's Title VII sexual harassment claim and the City has not sought summary judgment on her retaliation claim, those corresponding constitutional claims are unaffected by this particular principle.

However, the City also maintains that <u>any</u> remaining § 1983 claims are subject

to summary judgment "because Plaintiff bears an additional element of proof on § 1983 claims brought against a municipality . . . . [–]there must be proof of an unconstitutional policy of the municipality." (Doc. 31 at 16-17). The City's argument and cited cases correctly reflect the well-known rule, announced in *Monell*,[17] for imposing constitutional liability upon public bodies, like the City, by way of § 1983.

In response to the City's Partial Motion, Ms. Pressley only expressly discusses why imposing municipal liability on the City for not preventing sexual harassment as protected under the equal protection clause satisfies *Monell*. As a result, Ms. Pressley has only preserved her § 1983 claim against the City contained in Count IV and has abandoned all of her other § 1983 claims against it, including her equal protection claims asserted in Counts II and VIII. Thus, the City's Partial Motion is **GRANTED** as to Counts II and VIII of Ms. Pressley's complaint.

Regarding contested Count IV, Ms. Pressley primarily relies upon *Griffin v. City of Opa-Locka*, 261 F.3d 1295 (11th Cir. 2001), and the unpublished authority of *Bruno v. Monroe Cty.*, 383 F. App'x 845 (11th Cir. 2010) (per curiam), to convince this court she has a triable equal protection-based harassment claim against the City. The City likewise contends that Ms. Pressley's policy and custom evidence is

---

[17] The full citation is *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)

deficient in light of *Griffin*. Thus, because *Griffin* is integral to both sides' positions, the court discusses it at length below.

In setting out the appropriate framework for evaluating this type of claim, the *Griffin* court explained:

> Clearly, the City did not have a formal policy condoning or endorsing sexual harassment or sexual assault by City employees. Nevertheless, § 1983 liability may be imposed on a municipality based on "governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Id.* at 795. This Court set out the standard for imposing such liability in *Brown*, stating that:
>
> > [t]o prove § 1983 liability against a municipality based on custom, a plaintiff must establish a widespread practice that, "although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a 'custom or usage' with the force of law."
>
> *Brown*, 923 F.2d at 1481 (citations omitted). In addition, we have also held that a municipality's failure to correct the constitutionally offensive actions of its employees can rise to the level of a custom or policy "if the municipality tacitly authorizes these actions or displays deliberate indifference" towards the misconduct. *Brooks v. Scheib*, 813 F.2d 1191, 1193 (11th Cir. 1987).

*Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1308 (11th Cir. 2001).

The evidence of deliberate indifference to a widespread problem of sexual harassment in *Griffin* was overwhelming. Specifically, the Eleventh Circuit summarized that "without any question that sexual harassment was the on-going,

accepted practice at the City and that the City Commission, Mayor, and other high ranking City officials knew of, ignored, and tolerated the harassment." *Id.* at 1308. Additionally, the record revealed a "workplace [that] was permeated with vulgar, demeaning, and sexually suggestive conversations about women, improper demands for sexual favors and dates, unwelcome sexual advances, as well as unfair treatment for those women unwilling to reciprocate such conduct and who were not considered 'team players.'" *Id.*

The court discussed in detail the numerous examples of harassing conduct that occurred within the workplace, including the municipal manager's sexual assault of the plaintiff. *Id.* at 1308-12. Additionally, "[t]he City did not have a sexual harassment policy, nor was there any specific person or entity designated to receive sexual harassment complaints." *Id.* at 1311. "There [also] was no sexual harassment training." *Id.* Ultimately, the *Griffin* court reversed the district court's judgment as to the municipality's liability for the sexual assault because there was "no express finding" of a custom or policy concerning rape or sexual assault, but "uph[e]ld the jury's conclusion that the City had a policy or custom of ignoring or tolerating gross sexual harassment." *Id.* at 1312.

Ms. Pressley's policy and custom evidence includes: (i) Mr. Abernathy's daily demands for sexual favors from Ms. Pressley and Ms. McCurry; (ii) the failure to

34

distribute a sexual harassment policy to temporary employees (Doc. 30-1 at 18 at 65);[18] and (iii) the failure to provide temporary employees with any training on sexual harassment. *Id.* Additionally, Mr. Duncan testified that he was unaware of any sexual harassment policy that was in place and did not recall receiving training. (*See* Doc. 37-5 at 8 at 32 ("Not to my knowledge, sir. . . . Not to my knowledge that there was any policy");[19] *id.* at 8-9 at 32-33 (answering "No, sir" to question of whether Mr. Duncan had ever gone "to a training session on sexual harassment?"). Another Department supervisor, Mr. Hill, could not recall one way or the other whether the City had a sexual harassment policy or whether he received any training. (Doc. 37-4 at 50; *id.* at 51).[20] Importantly, the <u>only</u> documentation produced by the City confirming that <u>Mr. Abernathy</u> has ever received such training are sign-in sheets from

---

[18]  The City claims to have had a sexual harassment policy in place during 2012 that was distributed to <u>permanent</u> employees, but the policy produced during discovery does not specify an effective date (Doc. 26-5) and is not attached to a dated memorandum issued by the City manager which would have been the customary practice for personnel policies issued prior to 2013. (Doc. 44 at 8 ¶¶ 6, 8); (*see also* Doc. 26-3 at 18 at 66-68).

[19]  Any first page references to Doc. 37-5 correspond with the court's CM/ECF numbering system.

[20]  Citing to Doc. 37-3 of the court file, Ms. Pressley also contends that Mr. Bussey similarly responded negatively when asked if he had received any sexual harassment training. (Doc. 44 at 34). However, as mentioned in n.9, Doc. 37-3 is a second copy of Mr. Davis's declaration.

November 2012 (*i.e.*, <u>post-dating</u> Ms. Pressley's last day of employment and the filing of her EEOC charge). (Doc. 30-1 at 20 at 73).

Ms. Pressley also relies upon the testimony from Mr. Davis to show custom or policy. In particular, Mr. Davis witnessed Mr. Abernathy harassing Ms. Pressley in front of other supervisors and no one would do anything about it. (Doc. 37-2 at 2 ¶ 5). Mr. Davis also complained directly to Mr. Abernathy about his conduct in late August 2012, to which Mr. Abernathy responded, "'Why? Are you fu*king her or something?'" *Id.*

Additionally, Ms. Pressley points to a document dated October 15, 2012, written by Jeff Feazell ("Mr. Feazell"), an employee with the Department, in which he complained about feeling "uncomfortable" after witnessing on September 5, 2012, Ms. McCurry's making "cat noises from her seat in the truck [and Mr. Abernathy], who was standing beside his truck, grabbed his crotch [and] shook it at her." (Doc. 37-6 at 1). During her deposition, Ms. Austin acknowledged that, at some point after Ms. Pressley had filed her original and amended charge (Doc. 30-1 at 46 at 178-79), she had heard about Mr. Feazell's complaint through the City's Manager, but had not ever seen the actual document. (Doc. 26-3 at 30 at 114). Ms. Austin did not know if anyone had conducted an investigation into Mr. Feazell's complaint. (Doc. 26-3 at

36

30 at 115).[21]

Ms. Pressley also maintains that merely having a sexual harassment policy in place does not insulate the City from *Monell* liability, especially when that policy was not disseminated to seasonal employees. *Cf. Bruno*, 383 F. App'x at 849 (recognizing that mere existence of a sexual harassment policy "does not automatically satisfy [an employer's Title VII] burden" when invoking the *Faragher/Ellerth* affirmative defense (quoting *Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1314 (11th Cir. 2001))). Ms. Pressley further contends that the above proof is sufficient to create a jury question on her equal protection claim against the City. While the caliber of Ms. Pressley's evidence of harassment certainly falls short of *Griffin*, her evidence of actual or constructive knowledge is much closer. Further, the Eleventh Circuit's holding in *Griffin* does not dictate that, in the absence of such extensive custom evidence, a *Monell* claim against a municipality will not lie. Ultimately, the court is

---

[21] The court acknowledges the City's request, embedded in a footnote, that the court not consider the written complaint made by Mr. Feazell as relevant custom or policy evidence because Ms. Pressley had already been laid off by the time the document was created. (Doc. 53 at 10 n.14). The City cites to no authority to support its position and also has not separately moved to strike this evidence. To the extent the City is asking the court to disregard this proof as temporally irrelevant, the request is **DENIED** as underdeveloped, especially given that the letter refers to an incident involving Mr. Abernathy that took place during Ms. Pressley's employment with the City. Alternatively, its request is **TERMED** as **MOOT** because sufficient evidence otherwise exists in the record to support Ms. Pressley's *Monell* claim against the City.

persuaded that a reasonable jury could return a verdict against the City as a "moving force," *Monell*, 436 U.S. at 694, 98 S. Ct. at 2038, behind Mr. Abernathy's widespread sexual harassing behavior because a totality of the circumstances reflects the City's extreme lack of attention and commitment to implement and enforce the policy designed to protect its workforce from sexual harassment. *Cf. Farley v. Am. Cast Iron Pipe Co.*, 115 F.3d 1548, 1554 (11th Cir. 1997) ("Our circuit thus places upon the employer an obligation to make reasonable efforts to know 'what is going on' with respect to its own employees."); *id.* ("Where there is no policy, or <u>where there is an ineffective or incomplete policy</u>, the employer remains liable [under Title VII] for conduct that is so severe and pervasive as to confer constructive knowledge.") (emphasis added).[22] Thus, the City's Partial Motion is **DENIED** as to Count IV.

### 4.   Ms. Pressley's Negligent Training and Supervision Claim against the City

Ms. Pressley bases her negligent training and supervision claim on the City's failure to prevent Mr. Abernathy's harassing conduct. The City raises two grounds in support of dismissing this state law claim. First, it contends that Ms. Pressley lacks

---

[22]   The court acknowledges that neither *Bruno* nor *Farley* involves a § 1983 sexual harassment claim. Nonetheless, these cases provide this court with persuasive guidance about when a municipality's lackadaisical attitude about a sexual harassment policy can satisfy *Monell*.

proof "that the City knew or should have known that Abernathy would engage in sexual harassment." (Doc. 31 at 18). The City cites to several cases for support, including *Mardis v. Robbins Tire & Rubber Co.*, 669 So. 2d 885 (Ala. 1995).

In *Mardis*, the Alabama Supreme Court described the framework for determining whether a plaintiff has presented a triable issue of negligent training and supervision:

> [I]n the master and servant relationship, the master is held responsible for the servant's incompetency when notice or knowledge, either actual or presumed, of the incompetency has been brought to the master. For the master to be held liable for the servant's incompetency, it must be affirmatively shown that had the master exercised due and proper diligence, the master would have learned of the incompetency. This may be done by showing specific acts of incompetency and showing that they were brought to the knowledge of the master, or <u>by showing them to be of such a nature, character, and frequency that the master, in the exercise of due care, must have had notice of them.</u> While specific acts of alleged incompetency cannot be shown to prove that the servant was negligent in doing or omitting to do the act complained of, it is proper, <u>when repeated acts of carelessness and incompetency of a certain character are shown on the part of the servant, to leave it to the jury to determine whether they would have come to the master's knowledge had the master exercised ordinary care.</u>

*Mardis*, 669 So. 2d at 889 (emphasis added). The court finds that Ms. Pressley's evidence meets this standard for those same reasons explained above when analyzing the sufficiency of her § 1983 *Monell* claim.

Second, the City argues that state-agent immunity protects it from liability.

39

(Doc. 31 at 19). In *Ex parte Butts*, 775 So. 2d 173 (Ala. 2000), the Supreme Court of

Alabama adopted the following state-agent immunity test:

> A State agent shall be immune from civil liability in his or her personal
> capacity when the conduct made the basis of the claim against the agent
> is based upon the agent's
>
> (1) formulating plans, policies, or designs; or
>
> (2) exercising his or her judgment in the administration of a department
> or agency of government, including, but not limited to, examples such
> as:
>> (a) making administrative adjudications;
>>
>> (b) allocating resources;
>>
>> (c) negotiating contracts;
>>
>> (d) hiring, firing, transferring, assigning, or supervising
>> personnel; or . . . .
>
> Notwithstanding anything to the contrary in the foregoing statement of
> the rule, a State agent *shall not* be immune from civil liability in his or
> her personal capacity
>
> (1) when the Constitution or laws of the United States, or the
> Constitution of this State, or laws, rules, or regulations of this State
> enacted or promulgated for the purpose of regulating the activities of a
> governmental agency require otherwise; or
>
> (2) when the State agent acts willfully, maliciously, fraudulently, in bad
> faith, beyond his or her authority, or under a mistaken interpretation of
> the law.

*Ex parte Butts*, 775 So. 2d at 177-78 (emphasis by underlining added) (quoting *Ex*

*parte Cranman*, 792 So. 2d 392 (Ala. 2000), *holding modified on other grounds by*

*Hollis v. City of Brighton*, 950 So. 2d 300, 309 (Ala. 2006) (emphasis by italicizing

in *Ex parte Cranman*)).

In moving for summary judgment on this ground, the City analyzes the actions

of Mr. Dean, Mr. Abernathy's supervisor, as "he was imposed with the duty of

training and supervising [Mr.] Abernathy." (Doc. 31 at 19). However, Ms. Pressley

has not sued Mr. Dean or identified him as a wrongful actor. Instead, her complaint

seeks to hold the City liable for not preventing the wrongful actions of Mr.

Abernathy. Further, none of the cases cited by the City confirms that it would ever be

appropriate for this court to analyze the actions of Mr. Dean (instead of Mr.

Abernathy) when determining whether the defense of state-agent immunity is

properly invoked by the City.

Turning to the conduct of Mr. Abernathy, who is the agent that Ms. Pressley

relies upon to support her negligent training and supervision claim against the City,

the court finds that state-agent immunity does not apply to him, because a reading of

the record that is favorable to Ms. Pressley shows that he acted willfully and/or

beyond his authority in harassing her and that such a willful level of intent precludes

the application of state agent immunity. *Cf. Hollis v. City of Brighton*, 950 So. 2d 300,

305 (Ala. 2006) ("A finding of immunity, however, precludes a claim based in

negligence."). Thus, for all these reasons, the City has not met its burden to show that state-agent immunity protects it from liability on Ms. Pressley's negligent training and supervision claim. Accordingly, the City's Partial Motion as to Count IX is **DENIED**.

### B.    Mr. Abernathy's Motion

#### 1.    Ms. Pressley's Constitutional Claims against Mr. Abernathy

Mr. Abernathy contends that he is entitled to summary judgment on Count II (failure to hire on the basis of gender), Count IV (sexual harassment), and Count VIII (retaliatory failure to rehire). These constitutional claims are brought against Mr. Abernathy in his individual capacity and he has, in turn, expressly invoked the defense of qualified immunity for some of them.

"The defense of qualified immunity completely protects government officials performing discretionary functions from suit in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Cottone v. Jenne*, 326 F.3d 1352, 1357 (11th Cir. 2003) (internal quotation marks omitted) (quoting *Gonzalez v. Reno*, 325 F.3d 1228, 1233 (11th Cir. 2003)). "To receive qualified immunity, a government official first must prove that he was acting within his discretionary authority." *Id*.

This is a two-part test. Under the first step, "the defendant must [prove that he or she was] performing a function that, but for the alleged constitutional infirmity, would have fallen within his legitimate job description." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1266 (11th Cir. 2004). Next, the defendant must prove that he or she was "executing that job-related function." *Id.* at 1267. "Once a defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity." *Cottone*, 326 F.3d at 1358.

Until 2009, the Supreme Court required a two-part inquiry to determine the applicability of qualified immunity, as established by *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001). Under the *Saucier* test, "[t]he threshold inquiry a court must undertake in a qualified immunity analysis is whether [the] plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer*, 536 U.S. 730, 736, 122 S. Ct. 2508, 2513,153 L. Ed. 2d 666 (2002).

If, under the plaintiff's allegations, the defendant would have violated a constitutional right, "the next, sequential step is to ask whether the right was clearly established." *Cottone*, 326 F.3d at 1358 (quoting *Saucier*, 533 U.S. at 201, 121 S. Ct. at 2156). The "clearly established" requirement is designed to assure that officers have fair notice of the conduct which is proscribed. *Hope*, 536 U.S. at 739, 122 S. Ct.

43

at 2515. This second inquiry ensures "that before they are subjected to suit, officers are on notice their conduct is unlawful." *Saucier*, 533 U.S. at 206, 121 S. Ct. at 2158.

The "unlawfulness must be apparent" under preexisting law.[23] *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039, 97 L. Ed. 2d 523 (1987) (citing *Malley v. Briggs*, 475 U.S. 335, 344-45, 106 S. Ct. 1092, 1097-98, 89 L. Ed. 2d 271 (1986)). Therefore, a temporal requirement exists related to this inquiry. More particularly, a plaintiff must show that a reasonable public officer would not have believed his actions to be lawful in light of law that was clearly established at the time of the purported violation. *See Anderson*, 483 U.S. at 639, 107 S. Ct. at 3038 ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action[,] assessed in light of the legal rules that were 'clearly established' <u>at the time</u> it was taken[.]") (emphasis added) (citation omitted); *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S. Ct. 596, 599, 160 L. Ed. 2d 583 (2004) ("If the law <u>at that time</u> did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed,

---

[23] Only Supreme Court, Eleventh Circuit, and Alabama Supreme Court cases can "clearly establish" the law. *See Thomas v. Roberts*, 323 F.3d 950, 953 (11th Cir. 2003) ("In this circuit, rights are 'clearly established' by decisions of the Supreme Court, this court, or the highest court of the state in which the case arose." (citing *Hamilton v. Cannon*, 80 F.3d 1525, 1532 n.7 (11th Cir. 1996))).

even the burdens of litigation.") (emphasis added); *Brosseau*, 543 U.S. at 198, 125 S. Ct. at 599 ("Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct.") (emphasis added); *see also Johnson v. Clifton*, 74 F.3d 1087, 1093 (11th Cir. 1996) ("We know of no [preexisting] case which might have clearly told Clifton that he could not take the disciplinary action indicated by an investigation which was initiated before he even knew about the allegedly protected speech, and in circumstances where the public concern implication was doubtful.").

However, the *Saucier* framework was made non-mandatory by the Supreme Court in *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 818, 172 L. Ed. 2d 565 (2009), in which the Court concluded that, "while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory." Thus, "judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.*

Despite the Supreme Court's modification of *Saucier*'s analytical process, the substantive analysis remains unchanged; an officer is entitled to qualified immunity protection as long as he "could have believed" his conduct was lawful. *Hunter v.*

*Bryan*, 502 U.S. 224, 227, 112 S. Ct. 534, 536, 116 L. Ed. 2d 589 (1991).Therefore, to deny immunity, a plaintiff must affirmatively demonstrate that "no reasonable competent officer would have" acted as the public official did. *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 1096, 89 L. Ed. 2d 271 (1986). Given these qualified immunity principles, the court addresses each constitutional count in turn.

### a.   Count II–Disparate Treatment in Hiring on the Basis of Sex

In Count II of Ms. Pressley's complaint, she contends that Mr. Abernathy did not hire her as a permanent employee because of her gender in violation of the equal protection clause. Mr. Abernathy has raised qualified immunity as an affirmative defense. (Doc. 27 at 14-15).[24] The court has already analyzed the merits of Ms. Pressley's Title VII gender discrimination claim under Count I in conjunction with the City's Partial Motion and found Ms. Pressley's evidence to be insufficient to create a triable issue.

As explained in *Crawford*, *supra*, "the analysis of disparate treatment claims under § 1983 is identical to the analysis under Title VII where the facts on which the claims rely are the same." Therefore, the court finds that Mr. Abernathy is entitled to qualified immunity on Count II because, akin to the court's above analysis of Count

---

[24]   Any page references to Doc. 27 correspond with the court's CM/ECF numbering system.

I, no reasonable jury could find that Ms. Pressley has shown a constitutional violation by Mr. Abernathy with respect to the permanent hiring process <u>on the basis of gender</u>.[25] Therefore, Mr. Abernathy's Motion is **GRANTED** as to Count II.

### b.   Count IV–Sexual Harassment

Mr. Abernathy does not expressly invoke qualified immunity in response to Ms. Pressley's equal protection-based sexual harassment claim. Mr. Abernathy does, however, maintain that Ms. Pressley's evidence "is far below the 'minimum level of severity or pervasiveness necessary for harassing conduct to constitute discrimination in violation of Title VII.'" (Doc. 27 at 19) (quoting *Mendoza*, 195 F.3d at 1246, and citing collection of persuasive cases).

In opposition, Ms. Pressley points out that her case is significantly different than *Mendoza*. Consistent with the court's denial of summary judgment to the City on Count III above, and considering the key facts in *Mendoza* discussed below, the court agrees.

"Mendoza worked in Borden's Miami facility for a total of sixteen months" and for the supervisor who she complained about for eleven months. 195 F.3d at 1242, 1243. Mendoza testified that her supervisor "was constantly watching [her] and

---

[25]  Ms. Pressley has not challenged whether Mr. Abernathy was exercising his discretionary authority concerning Count II.

following [her] around and looking [her] up and down[.]" 195 F.3d at 1242 (internal quotation marks omitted). She "also testified about two instances when [her supervisor] 'looked at [her] up and down, and stopped in [her] groin area and made a ... sniffing motion.'" *Id.* at 1243. "Mendoza admitted that [her supervisor] also *never said anything to her* during what she perceived to be the sniffing nor the looking up and down." *Id.* (emphasis in original).

Mendoza alleged that on one occasion at the fax machine, her supervisor "'rubbed his right hip up against [her] left hip' while touching her shoulder and smiling." *Id.* "Finally, Mendoza described an incident when she confronted [her supervisor] by entering his office and saying 'I came in here to work, period.'" *Id.* According to Mendoza, [he] responded by saying 'Yeah, I'm getting fired up, too.'" *Id.* "[T]his was the only time where [her supervisor] said anything to Mendoza that she perceived to be of a sexual nature." *Id.*

In contrast to the dubious, if not non-existent, sexually-driven conduct in *Mendoza*, and, as this court summarized Ms. Pressley's evidence in addressing Count IV of the City's Partial Motion:

> Ms. Pressley's sexual harassment claim is premised upon Mr. Abernathy's repeated, numerous, and daily requests for her to show him her tattoos and her nude photos. Additionally, on at least one occasion, Mr. Abernathy pressured her to show him her breasts and in another instance asked her "does the carpet match the drapes?" Often times these

> sexually-demeaning incidents occurred in front of other employees. All of these acts occurred over a relatively short period of time and, based upon her testimony, a reasonable jury could infer that Ms. Pressley endured some type of sexually-charged comment, question, or demand for a sexual favor by Mr. Abernathy at least once a week, if not more frequently than that. . . .

> Further, the record, taken in a light most favorable to Ms. Pressley, substantiates that she did not welcome Mr. Abernathy's advances, that she rejected doing any of the sexually-charged acts that he was asking of her, that she was subjectively bothered by and complained to Mr. Bussey about Mr. Abernathy's objectionable conduct, that, despite her complaint, Mr. Abernathy's behavior continued, and that she demanded that Mr. Abernathy stop.

*See supra* at 24-25. Additionally, and unlike *Mendoza*, 195 F.3d at 1243 n.2, Ms. Pressley (i) has adduced a corroborating eye-witness, Mr. Davis, who confirms Mr. Abernathy's harassing conduct towards her occurred almost daily and (ii) has offered further evidence of Mr. Abernathy's sexually-driven conduct through his similar treatment of Ms. McCurry.

Turning to the *Mendoza* factors, Ms. Pressley has undoubtedly shown the frequency of the gender-based offensive conduct, not only through her own testimony, but also through Mr. Davis's corroborating declaration as an eye-witness. Based upon this evidence, a reasonable jury could infer that Ms. Pressley endured some type of sexually-charged comment, question, or demand by Mr. Abernathy at

least once a week, if not more frequently than that.[26] Likewise, a supervisor's repeated requests to see an employee's tattoos, nude photos and, at least on one occasion, make a separate request for her to show him her breasts as well as ask her about the color of her pubic hair over a six-month period go well beyond boorish or flirtatious behavior and are sufficiently severe to satisfy the second *Mendoza* factor.

Concerning the third factor, Mr. Abernathy's sexually-charged comments were more than mere offensive utterances about women generally as they were squarely directed at either Ms. Pressley or Ms. McCurry–the only female employees who worked for the Department. Mr. Abernathy was unrelenting in his sexually-explicit treatment of Ms. Pressley, despite her unequivocal and repeated resistance to his sexual demands. Further, often times Mr. Abernathy would make these sexually-demeaning comments in front of other employees, and Ms. Pressley testified how his actions made her feel ashamed and embarrassed. (Doc. 26-1 at 54 at 209-10).

The fourth *Mendoza* factor has both a subjective and an objective component. *See Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 586 (11th Cir. 2000) ("The fourth factor in determining whether conduct and statements are 'sufficiently severe or

---

[26]   Based upon this court's calculations, that translates into a range of approximately 26 sexual comments or questions directed at Ms. Pressley by Mr. Abernathy, if occurring once a week, or 130, if occurring every day of a five-day work week. She also witnessed Mr. Abernathy's similar treatment of Ms. McCurry.

pervasive' to create a hostile work environment is whether the conduct and statements unreasonably interfere with the plaintiff's job performance–a factor which involves both a subjective and objective inquiry." (citing *Mendoza*, 195 F.3d at 1246), *overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S. Ct. 2405, 2415, 165 L. Ed. 2d 345 (2006)).

This court is aware that Title VII does not obligate Ms. Pressley to show that Mr. Abernathy's behavior caused her serious psychological harm. *Harris*, 510 U.S. at 22, 114 S. Ct. at 22. Instead, she must present sufficient evidence to conclude that "the environment would reasonably be perceived, and [wa]s perceived [by her], as hostile or abusive . . . ." *Id.* (emphasis added) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S. Ct. 2399, 2405, 91 L. Ed. 2d 49 (1986)). Here, the court finds that Ms. Pressley's complaints to Mr. Bussey and to Mr. Abernathy directly reflect her subjective feelings that Mr. Abernathy's conduct was unreasonably interfering with her job. The court further easily finds that repeated demands from a supervisor to see her tattoos and nude photos, a separate request for her to expose her breasts, and a question about the color of her pubic hair "would … have interfered with a reasonable employee's performance of her job." *Gupta*, 212 F.3d at 586.

The court acknowledges the litany of sexual harassment cases cited by Mr.

Abernathy that are lifted from the *Mendoza* decision. (Doc. 27 at 19-20 n.60). As all of them arise outside of the Eleventh Circuit they are, of course, not binding on this court. The *Mendoza* court simply referred to these cases to better frame the sexual harassment issue before it–the Eleventh Circuit did not expressly or implicitly adopt those decisions by other circuits as binding precedent. Further, Mr. Abernathy has made no attempt to highlight those cases that have facts that are comparable to this case and, in any event, the court is simply not persuaded to follow any of them in light of the differing facts contained in this record. The court similarly is not persuaded to follow the Fifth Circuit and Seventh Circuit decisions or the unpublished, and therefore non-binding, Eleventh Circuit opinions mentioned elsewhere in Mr. Abernathy's brief due to their differing facts. (Doc. 27 at 24-27).

For example, Mr. Abernathy relies upon the Fifth Circuit's unpublished decision in the racial hostile environment case of *Barkley v. Singing River Elec. Power Ass'n*, 433 F. App'x 254 (5th Cir. 2011), and contends that Ms. Pressley's allegations of sexual harassment are too generalized to withstand summary judgment. (Doc. 27 at 24-25). If all Ms. Pressley had claimed was that Mr. Abernathy harassed her on a daily basis, then her case would be closer to *Barkley*. However, she gave several specific examples of harassing incidents that she experienced and her allegations about repeated instances of harassing behavior have been corroborated by

52

Mr. Davis. Also, the plaintiff in *Barkley* "testified that the harassment had no impact on his work." 433 F. App'x at 258. Therefore, Ms. Pressley's case is significantly unlike *Barkley*.

The court also rejects Mr. Abernathy's reliance upon *Corbitt v. Home Depot U.S.A., Inc.*, 573 F.3d 1223 (11th Cir.) ("*Corbitt I*"), *opinion vacated and superseded*, 589 F.3d 1136 (11th Cir. 2009), *reh'g en banc granted, opinion vacated*, 598 F.3d 1259 (11th Cir.), *and dismissed as settled on reh'g en banc*, 611 F.3d 1379 (11th Cir. 2010)[27] and *Gupta* as inapposite to the facts at issue here. More specifically, in the now-vacated *Corbitt I* decision, the Eleventh Circuit characterized many of the supervisor's challenged comments as either "merely complimentary" or "clearly flirtatious," and clarified that such "ordinary" statements, even by a supervisor, are "not sexual harassment for the purposes of Title VII." *Corbitt*, 573 F.3d at 1240.

---

[27] Concerning vacated opinions, the Eleventh Circuit has instructed:

> Parts of decisions that are vacated and have not been reinstated "have no legal effect whatever. They are void." *United States v. Sigma Int'l, Inc.*, 300 F.3d 1278, 1280 (11th Cir. 2002) (en banc). We are free to give statements in a vacated opinion persuasive value if we think they deserve it. *See Tallahassee NAACP v. Leon County*, 827 F.2d 1436, 1440 (11th Cir. 1987).

*Friends of Everglades v. S. Florida Water Mgmt. Dist.*, 570 F.3d 1210, 1218 (11th Cir. 2009).

Likewise, in *Gupta*, the bulk of what the plaintiff complained about as harassment by her supervisor lacked "a[n] [apparent] sexual or gender-related nature–'sexual advances, requests for sexual favors, [or] conduct of a sexual nature.'" *Gupta*, 212 F.3d at 583 (quoting *Mendoza*, 195 F.3d at 1245). Here, Mr. Abernathy's comments were unmistakably sexual, far from complimentary or ordinary, and could only be considered flirtatious if, perhaps, he was acting in an X-rated movie. Therefore, the court concludes that, based upon a totality of the circumstances, a reasonable jury could return a verdict in Ms. Pressley's favor against Mr. Abernathy for sexual harassment, and Mr. Abernathy's Motion is **DENIED** as to Count IV.

### c.   Count VIII–Disparate Treatment in Hiring on the Basis of Retaliation

To the extent that part of Count VIII overlaps with Ms. Pressley's gender-based allegations contained in Count II, Mr. Abernathy's Motion is **GRANTED** for those reasons discussed *supra*. However, Mr. Abernathy's Motion is insufficiently developed and unpersuasive with respect to Ms. Pressley's § 1983 claim premised upon <u>retaliation</u>, and accordingly is **DENIED**. In particular, Mr. Abernathy invokes the status-based standard applicable in Title VII discrimination cases without ever mentioning the *prima facie* formulation for retaliation claims. (*See* Doc. 27 at 29 (describing *prima facie* standard for Title VII discrimination claims to include

evidence of an adverse employment action and citing to *Crawford*, 529 F.3d at 970-71)). However, ever since the Supreme Court's decision in *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006), retaliation claims are subject to a more relaxed standard than status-based ones. *See id.* at 68, 126 at 2415 (internal quotation marks omitted) ("In our view, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.").

Similarly, while Mr. Abernathy acknowledges in his brief Ms. Pressley's complaints about his harassment and her additional allegations made in Count VIII when compared with Count II (Doc. 27 at 28), the remainder of his argument treats Count VIII as being limited to gender-based discrimination. To the contrary, Count VIII contains retaliation-based language alleging that Ms. Pressley "filed an EEOC charge for sex discrimination and retaliation" (Doc. 1 at 22 ¶ 99) and that she "was not rehired . . . because Plaintiff opposed gender-based discriminatory practices." (*Id.* ¶ 101). Importantly, Mr. Abernathy never even uses the term "retaliation" much less addresses Ms. Pressley's retaliation claim head on, and, consequently, he has wholly failed to carry his initial burden, as the movant, on summary judgment regarding the

merits of this particular claim.[28] *See Reese v. Herbert*, 527 F.3d 1253, 1268 (11th Cir. 2008) ("The movant . . . continues to shoulder the initial burden of production in demonstrating the absence of any genuine issue of material fact, and <u>the court must satisfy itself that the burden has been satisfactorily discharged</u>.") (emphasis added).

This same reasoning applies to Mr. Abernathy's passing reference made to a qualified immunity defense that appears to relate back to gender discrimination. (*See* Doc. 27 at 30 ("Likewise, to the extent that plaintiff claims that Abernathy failed to do more than he did, such would be protected by qualified immunity, as set forth in the discussion above.")). Additionally, while Mr. Abernathy boldly asserts that Ms. Pressley "has failed to show that Abernathy caused her to not be hired . . . ." (Doc. 27 at 27), a reasonable inference can be drawn from this record that Mr. Abernathy, angered by Ms. Pressley's opposition to sexual harassment and her <u>specifically telling him to stop</u>, was indeed the City's decision-maker who caused or, at a minimum, substantially contributed to the non-hiring of Ms. Pressley on a permanent basis by (i) promising her such a position, but holding onto her paperwork and submitting it to personnel only after "finding it on his desk" (Doc. 27 at 16), and (ii) giving shifting, if not nonsensical, explanations during his deposition about why she was not

---

[28]   As such, Mr. Abernathy, like the City, has only filed a <u>partial</u> motion for summary judgment.

hired, including blaming her for the failure to complete the paperwork properly (even though he confirmed turning her application into personnel) or to come see him personally and/or referencing that he did not have her paperwork, but that he did have an EEOC claim. (Doc. 26-2 at 54 at 211). Therefore, even if Mr. Abernathy had properly invoked qualified immunity as a defense to Ms. Pressley's retaliation claim (which he has not), a jury would have to resolve a series of material factual issues before the court could properly evaluate whether a defense of qualified immunity bars that claim. *See, e.g., Johnson v. Breeden*, 280 F.3d 1308, 1318 (11th Cir. 2002) ("It is important to recognize, however, that a defendant is entitled to have any evidentiary disputes upon which the qualified immunity defense turns decided by the jury so that the court can apply the jury's factual determinations to the law and enter a post-trial decision on the defense.").[29]

---

[29] Mr. Abernathy's reply brief misses the mark as well. Although he mentions that the record lacks a "showing that he was aware of the EEOC charge at exactly the same time the City" did (Doc. 51 at 9), he ignores the sexual harassment complaint that Ms. Pressley made to him directly and her ability to show opposition-based Title VII retaliation. More specifically, "[a]n employee is protected from discrimination if (1) '[s]he has opposed any practice made an unlawful employment practice by this subchapter' (the opposition clause) or (2) '[s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter' (the participation clause)." *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1350 (11th Cir. 1999) (on petition for rehearing) (citing 42 U.S.C. § 2000e-(3)(a)).

2.    **Ms. Pressley's State Law Claims against Mr. Abernathy**

a.    **Count X–Invasion of Privacy**

Ms. Pressley maintains that Mr. Abernathy's treatment of her also constitutes an invasion of privacy under Alabama law. As the Supreme Court of Alabama has summarized the scope of an action for invasion of privacy:

> Since 1948, beginning with the case of *Smith v. Doss*, 251 Ala. 250, 37 So. 2d 118 (1948), Alabama has recognized the tort of "invasion of the right to privacy." *See Liberty Loan Corporation of Gadsden v. Mizell*, 410 So. 2d 45 (Ala. 1982); *Hamilton v. South Central Bell Telephone Company*, 369 So. 2d 16 (Ala. 1979).
>
> It is generally accepted that the invasion of privacy tort consists of four distinct wrongs: 1) the intrusion upon the plaintiff's physical solitude or seclusion; 2) publicity which violates the ordinary decencies; 3) putting the plaintiff in a false, but not necessarily defamatory, position in the public eye; and 4) the appropriation of some element of the plaintiff's personality for a commercial use. *Norris v. Moskin Stores, Inc.*, 272 Ala. 174, 132 So. 2d 321 (Ala. 1961), citing W. Prosser, *Law of Torts*, pp. 637-39 (2d ed. 1955).

*Phillips v. Smalley Maintenance Services, Inc.*, 435 So. 2d 705, 708 (Ala. 1983) (footnote omitted) (emphasis added). The Supreme Court of Alabama also has more specifically described a privacy claim premised upon the ground of wrongful intrusion as:

> [T]he wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities. *Phillips v. Smalley Maintenance*

58

*Services*, 435 So. 2d 705 (Ala. 1983); *Restatement (Second) of Torts* § 652B (1977).

*McIsaac v. WZEW-FM Corp.*, 495 So. 2d 649, 651 (Ala. 1986).

Mr. Abernathy argues in his Motion that summary judgment is appropriate, in part, because "[t]here is no alleged physical contact." (Doc. 27 at 32). He cites to *Rose v. SMI Steel LLC*, 18 F. Supp. 3d 1317 (N.D. Ala. 2014), for legal support. *See id.* at 1321 ("For sexual harassment to be actionable as invasion of privacy, 'Alabama courts have generally required invasion of privacy claims to allege both ongoing, persistent verbal harassment and unwanted physical contact.'" (quoting *Austin v. Mac-Lean Fogg Co.*, 999 F. Supp. 2d 1254, 1263 (N.D. Ala. 2014))); *see also Austin*, 999 F. Supp. 2d at 1263 (citing collection of state court cases in which cognizable privacy claim included a physical component, such as *Ex parte Atmore Cmty. Hosp.*, 719 So. 2d 1190, 1194 (Ala. 1998), *Phillips v. Smalley Maint. Servs., Inc.*, 435 So. 2d 705, 711 (Ala. 1983), and *Cunningham v. Dabbs*, 703 So. 2d 979, 980-81, 982 (Ala. Civ. App. 1997)).

He also challenges this claim on the basis that Ms. Pressley has not shown that his "conduct was so outrageous that it caused [her] mental suffering, shame, or humiliation." (*See* Doc. 27 at 31 (citing *Baldwin v. Blue Cross/Blue Shield of Alabama*, 480 F.3d 1287 (11th Cir. 2007)). Ms. Pressley has testified that Mr.

Abernathy's actions caused her to feel ashamed and embarrassed.

Ms. Pressley solely cites to *Busby v. Truswal Sys. Corp.*, 551 So. 2d 322 (Ala. 1989), in opposition to Mr. Abernathy's Motion. In *Busby*, the court framed the privacy question as "whether there was an offensive or objectionable prying or intrusion into the plaintiffs' private affairs or concerns." 551 So. 2d at 324. After describing 17 different categories of evidence that included a plethora of openly sexual incidents as well as inappropriate physical contact, such as stroking the plaintiffs' necks, the *Busby* court determined that "[a] jury could reasonably determine from this evidence that Deaton pried or intruded into the plaintiffs' sex lives in an offensive or objectionable manner and thereby invaded their right of privacy." *Id.* Ms. Pressley has not offered one example of a harassment case in which a claim for the invasion of privacy properly went to the jury despite the absence of any physical incident.

The court is persuasively guided by the observation in *Austin* (as restated in *Rose*) that a triable privacy claim involving sexually-harassing conduct customarily includes some type of offensive physical aspect to be cognizable under Alabama law. Further, in the absence of any physical contact or physically-threatening conduct by Mr. Abernathy, the court finds that his sex-based propositions and other comments aimed at Ms. Pressley were not sufficiently outrageous or personally intrusive to

60

constitute a triable invasion of privacy claim. *See Baldwin*, 480 F.3d at 1309, 1294, 1295 ("Assuming that Head did everything that Baldwin said he did [including asking her to 'blow [him], breathing down her neck, and unzipping his pants fly and moving the zipper up and down in front of her], his harassment of Baldwin was not sufficiently outrageous as a matter of Alabama law for either claim [*i.e.*, invasion of privacy or tort of outrage.]" (citing *McIsaac*, 495 So. 2d at 651-52, 650 (finding insufficient invasion of privacy claim based upon several invitations to dinner, an attempt to kiss, efforts to have an affair, and other more generalized objectionable conduct)). Accordingly, Mr. Abernathy's Motion is **GRANTED** as to Count X.

### b.    Count XI–Outrage

For reasons similar to the court's invasion of privacy ruling, Mr. Abernathy's Motion is also **GRANTED** as to Count XI. The Alabama Supreme Court first recognized the tort of outrage as a viable cause of action in *American Rd. Serv. Co. v. Inmon*, 394 So. 2d 361, 365 (Ala. 1980) (joining other states in "recognizing that one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress and for bodily harm resulting from the distress"). For an action to be sufficiently extreme, it must be "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable

in a civilized society." *Inmon*, 394 So. 2d at 265. Additionally, "[t]he emotional distress thereunder must be so severe that no reasonable person could be expected to endure it." *Id.*

As support for his Motion, Mr. Abernathy relies upon *Baldwin, supra*, and points out that "even after undergoing all that plaintiff says she suffered, the plaintiff was desirous of continuing to work, in a full-time capacity, in the same situation, with the same supervisor." (Doc. 27 at 33). Thus, Mr. Abernathy suggests that Ms. Pressley's efforts to become a permanent employee mean her emotional distress could not have reached the requisite level in which "no reasonable person could be expected to endure it."

In opposition, Ms. Pressley cites to *Rice v. United Ins. Co. of Am.*, 465 So. 2d 1100 (Ala. 1984) and *Busby*. (Doc. 40 at 28, 29). *Rice* involved a plaintiff who, after becoming pregnant, was a target of her supervisor's organized efforts "to force her to take disability leave rather than to work throughout her pregnancy." 465 So. 2d at 1102. The plaintiff's supervisor was allegedly unrelenting in his tactics, including "falsely accus[ing] her . . . of incompetence" and withholding "vital business information . . . from her[.]" *Id.* Eventually she was fired and suffered a miscarriage within one week of that dismissal. *Id.* Based upon these dramatically different facts, the Alabama Supreme Court found that the trial court had improperly dismissed the

62

plaintiff's claim for tort of outrage. *Id.* Because *Rice* is such an inapposite case, it does not persuade this court that Ms. Pressley has a viable outrage claim.

The court has already discussed the voluminous categories of harassing behavior at issue in *Busby* and found it to be strikingly dissimilar to the more limited scope of Ms. Pressley's case. Therefore, *Busby* does not convince the court that Ms. Pressley has a cognizable outrage claim, and she offers no other authorities for the court to consider. Ultimately, while Ms. Pressley's evidence of harassment is sufficient to satisfy Title VII's less exacting standard, she lacks proof of sufficiently egregious conduct and objectively extreme emotional distress to substantiate an outrage claim. *See Potts v. Hayes*, 771 So. 2d 462, 465 (Ala. 2000) (describing the "so limited" nature of outrage and observing that actionable conduct has been recognized in only three categories of cases, including *Busby*-like "'egregious sexual harassment'"); (*see also* Doc. 27 at 33 ("In short, whatever this conduct may be, as alleged, it is not outrage.")).

### C.   Mr. Abernathy's Strike Motion

The first part of Mr. Abernathy's Strike Motion (Doc. 52) seeks to strike the last sentence to the third paragraph of Ms. Pressley's declaration (Doc. 37-1) filed on March 3, 2016. That sentence states:

The three-month probation appears to be an excuse made up by Mr.

Abernathy or the City after I filed my EEOC charge and this lawsuit.

(Doc. 37-1 at 2 ¶ 3). Without citing to any authority, Mr. Abernathy maintains this sentence "constitutes speculation, opinion, matter beyond the personal knowledge of the witness, and inadmissible conclusion." (Doc. 52 at 1). This section of the Strike Motion is **TERMED** as **MOOT** because the court does not rely on this declarative statement as material evidence in denying summary judgment to Mr. Abernathy or the City in part.

The second part of Mr. Abernathy's Strike Motion seeks to strike the first sentence of the fourth paragraph of Ms. Pressley's declaration. That sentence states:

> I was never told that I should return to work on January 3, 2013 or at any other time.

(Doc. 37-1 at 2 ¶ 4).

Mr. Abernathy contends that this part of her declaration improperly contradicts Ms. Pressley's prior deposition testimony. Mr. Abernathy refers to *Van T. Junkins & Associates, Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984) ("When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony."), and *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1299-1300 (11th Cir.

64

2012) ("Relying on the sham affidavit doctrine, the district court disregarded Gallefoss's declaration, stating the 'deposition testimony was clear' and a declaration cannot be used to create a factual dispute when 'a party has given clear answers to unambiguous questions.'").

The court has read the referenced excerpts from Ms. Pressley's deposition transcript and compared them to Ms. Pressley's declaration in context several times. The court does not agree with Mr. Abernathy that a clear contradiction exists between the two forms of evidence because they relate to different topics–Ms. Pressley's vague recollection of a general time frame for seasonal employees to start as permanent employees as testified to in her deposition versus her recollection of never being given a specific starting date for her permanent employment as set forth in her declaration. In any event, that disagreement is of no consequence because the court does not rely on this declarative statement as material evidence in denying summary judgment to Mr. Abernathy or the City in part. Therefore, the second portion of the Strike Motion is also **TERMED** as **MOOT**.

## V.   CONCLUSION

The City's Partial Motion is **GRANTED IN PART** and **DENIED IN PART**. Mr. Abernathy's Motion is **GRANTED IN PART** and **DENIED IN PART**. Mr. Abernathy's Strike Motion is **TERMED** as **MOOT**. The City's embedded request

to disregard Mr. Feazell's complaint as part of Ms. Pressley's policy and custom evidence is **DENIED** or, alternatively, **TERMED** as **MOOT**.

All paramour favoritism and all disparate treatment in job assignment claims are **HEREBY DISMISSED WITH PREJUDICE**. Further, the following Counts are **HEREBY DISMISSED WITH PREJUDICE**:   Count I, Count II, Count VIII (against the City), Count VIII (against Mr. Abernathy for gender-discrimination with retaliation remaining for trial), Count X, and Count XI.

The Counts remaining in the action are Counts III, IV, V, VI, VII, VIII (claim for retaliation against Mr. Abernathy only), and IX. By separate order, the court will set this case for a pretrial conference.

**DONE** and **ORDERED** this the 7th day of September 2016.

**VIRGINIA EMERSON HOPKINS**
United States District Judge